## Seiler v. Lawrence.

March 14, 1950.

Rehearing denied June 13, 1950.

Rodney G. Bryson, Judge.

Howell W. Vincent, Bert King and George J. Schaefer for appellant.

William E. Wehrman for appellee.

JUDGE HELM—Affirming.

Appellee, Joseph Lawrence, pleads that he was employed by the appellant, Charles Dewey Seiler, to represent him "in the matter of income tax liabilities," and that appellant agreed to pay him therefor the sum of $12,000, plus expenses. In this action he seeks to recover " a balance of $8,000, fee, and $78.09, expenses." A jury awarded appellee the sum of $8,079. Appellant appeals.

Appellant assigns as reasons for a reversal: (1) A contract made to stifle or obstruct prosecution is unenforceable; (2); the promise to pay the debt of another must be in writing; (3) a juror is duty bound to divulge his connection or relationship with the attorneys in the case when inquiry is made of him; and (4) the verdict is not sustained by the evidence.

Appellee says he has been a lawyer for about 15 years, now in private practice with offices in Washington, D. C.; he was formerly employed by the United States Department of Justice as a Director for the Attorney General, in charge of Taxes and Penalties Division; he was associated with the Federal Government for 10 years; his experience had to do with compromises in the collection of all kinds of assessments growing out of Internal Revenue violations. On January 24, 1947, appellant, accompanied by Mr. Vincent, his local attorney came to his office in Washington to engage his services "as a tax lawyer to represent Mr. Seiler in a criminal tax case, which at that time had been referred to the Department of Justice by the Treasury Department, with a recommendation for prosecution." The amount of the tax claim of the Government was "something in the neighborhood of $75,000" against Mr. Seiler, the Seiler Motor Car Company, and two other corporations which were under his control. Seiler agreed to pay a retainer of $4,000, and "if I succeeded in working out Mr. Seiler's difficulties with the Government that would not result in confinement in a penitentiary, that he would pay me an additional $8,000." Seiler and his local attorney were advised that it was the strict policy of the Department of Justice not to compromise a criminal tax case involving civil liabilities without a plea of guilty in open court on the part of the defaulting taxpayer. After accepting the employment, appellee made a full disclosure of all of appellant's unreported income

to the Treasury Department, prepared and presented a brief to the Department. He explained to Seiler that he had to pay what he admitted he owed the Government; that he had "to get his house in order if he was going to avoid going to jail, * * * that's always the possibility in these criminal tax cases." The brief included a breakdown of a fictitious "Relies" (Seiler spelled backwards) account; a breakdown of all other accounts, including profits from sales of cars and used cars, which had been concealed, and including kickbacks or rebates from finance companies. The balance of $8,000 was to be paid "if I * * * succeeded in keeping Mr. Seiler from going to jail. If I succeeded in working out his income tax difficulties with the Government, resulting in what would be either a dismissal, or a suspended sentence."

Appellee "was engaged in this case at the very last minute." After conferences, he made every effort to settle this case through a compromise of paying the taxes, including the penalties. He 'apparently had succeeded in convincing the officials in the Department of Justice that there was an explanation for these other items," but the "Relies account could not be sufficiently explained." They felt that it at least should be referred to the United States Attorney at Louisville for his decision. Appellee had six conferences with the Justice and Treasury Departments at Washington. In his briefs and discussions with officials seeking a compromise rather than prosecution, he advanced as a defense the 'so-called Morgenthau policy. * * * a policy that had been adopted about three years before, which gave an opportunity to any taxpayer who had cheated on his taxes to come in and make a voluntary disclosure, which would avoid prosecution."

Appellee made several trips to Louisville. On February 27, 1947, when the United States Attorney was preparing to refer the matter to a grand jury, appellee, with Seiler, agreed to waive a grand jury. Seiler was charged in a Criminal Information; plead not guilty, and was released on his own recognizance in the amount of $5,000 in each case. At appellee's request, the cases were set for trial on April 9, 1947. On March 11, 1947, appellee conferred with the Collector of Internal Revenue at Louisville, and with Mr. Gray of the Intelligence Unit of the Internal Revenue Service. He and they finally arrived at a "payment of $120,000 or

thereabouts," $60,000 to be paid right then, and $60,000 over a period of five months. He then went to Covington and reported to Seiler and Mr. Vincent. Seiler said, "If I pay out that money, what guarantee have I got that I won't go to jail?" Appellee told him, "You have no guarantee * * * you are not in a position to bargain with your Government." Appellee said, "I had every reason to feel from the atmosphere in Louisville, from the way these gentleman had treated me in all of my conferences, * * * that the Government would be fair with us, and then I added the fateful statement, which is why I never got paid in this case. * * * I said, as a matter of fact, Senator Glenn told me at the end of our conference, that if we would not continue to fight the case that he received an assurance from Mr. Gray that he would recommend to the Government a suspended sentence for Mr. Seiler, provided that he would make a plea of guilty, and that was the last step—that was the step I knew would come about in this case the day that Mr. Vincent and Mr. Seiler walked into my office on January 24. * * * In about a half an hour, or thereabouts, they agreed to pay it. They would send me * * * a check for $60,000 and I was * * * to bring it back to Louisville * * *. I waited five or six days for that check, it never came, so on Monday I called up Mr. Seiler and I found out he was in Louisville, which, of course, surprised me a lot, and I made further inquiry and finally I got in touch with Mr. Vincent. I said, 'well, what happened?' * * *. He said, 'we got a suspended sentence on it.' "

Appellee told Vincent that the disposition of the case was the result of his work, and that he expected to be paid. He has not been paid the balance of $8,000, nor the expenses of his last trip. He stated, "I was informed that it would be much better for Mr. Seiler if I handled the case alone, because he had had the case here for three years, and I did not want to arouse any hostilities that he may have incurred in handling this case. I felt that for Mr. Seiler's benefit, and for my own, in getting a result in this case, I should proceed alone. I explained that situation to Mr. Vincent on the 24th of January, in my office, and he was wholly in agreement with that procedure."

Appellant was called as if on cross-examination.

Asked for what purpose he went to appellee's office in Washington, he stated, "to keep out of jail. * * * I told him I would pay him the $8,000 if he kept me out of jail." Asked, "Did you employ him?" he answered, "Yes, sir." Asked, "Did you go to jail?" he answered, "No, sir." Appellant, on direct examination by Mr. Vincent, told the jury that he did not get any benefit from the services of appellee. He told the jury that he paid the Government, in tax liabilities and penalties, $152,000, and "got a year and a day suspended sentence." On cross-examination Seiler admitted that he agreed to pay appellee the balance of $8,000 if he kept him out of jail. He admitted having a conference with Mr. Vincent and Mr. Lawrence at Mr. Vincent's office in Covington on March 12. It was after that that he and Mr. Vincent went to Louisville and paid his taxes. He did not tell Mr. Lawrence that he was going to Louisville.

Jurors are under duty to make known their connection or relationship with attorneys, when asked as to this on voir dire examination. Such questions were asked in this case. Two of the jurors made affidavits that one of the jurors had stated that the wife of attorney for appellee was one of her best friends. Counter affidavits were filed and a hearing was had by the trial court. The testimony was highly conflicting. We are unable to say the trial judge erred in his ruling on this question.

It is shown that appellant employed appellee and agreed orally to pay him certain fees. The promise to pay the debt of another must be in writing. Seiler did not promise to pay any debts of the corporations under his management or control. We conclude the contention that Seiler, in employing appellee, agreed orally to pay the debt of another and so is not bound because of the Statute of Frauds, is without merit.

Appellant and his local counsel seem to have made a full disclosure to appellee at their first conference in Washington. Appellee, in turn, appears to have informed appellant that it would be necessary for him to make a full disclosure of his tax liability to the Government, and explained to him fully the probabilities as to penalties and prosecution by the Government, and the possibility that he would be required to serve a term in

prison. After his employment appellee made a full disclosure to the Government, both at Washington and in Louisville. In his service as appellant's attorney, he appears to have followed the so-called Morgenthau plan. From the evidence which we have summarized rather fully, it is apparent that there was no contract on the part of appellee to stifle or obstruct justice, and that he did not in fact do so.

The jury found for appellee. The evidence is sufficient to support the verdict.

The judgment is affirmed.